## ANDERSON et al. v. INTEMANN et al.

No. 19210. Opinion Filed Oct. 8, 1929.

Rehearing Denied Nov. 12, 1929.

C. B. Holtzendorff and P. W. Holtzen-dorff, for plaintiffs in error.

Woodard & Westhafer, Edward P. Cronin, and A. J. Adams, for defendants in error.

HALL, C. Primarily, this was a mortgage foreclosure action by W. J. Intemann against numerous persons, companies and corporations, the principal ones being the Gunther City Coke, Coal & Mining Company, a corporation, William E. and Elizabeth Sunday, C. D. and Elizabeth Roseman, J. H. Maack and the Guernsey Savings Bank of Guernsey, Iowa.

The petition contained three causes of action, all of which were on promissory notes and for the foreclosure of three respective mortgages held by the plaintiff. Neither the execution of these mortgages nor their purported consideration was questioned. In fact, but one of the mortgages was assailed in any manner. That mortgage was the one embraced in the third cause of action, which was executed to plaintiff by the defendant Gunther City Coke, Coal & Mining Company to secure the sum of $33,413. That mortgage is the basis of the controversy here. Neither the validity nor the foreclosure of this mortgage was contested by the mortgagor, the person or corporation liable thereon.

The plaintiffs in error in this action, D.

M. Anderson and A. C. Gunther, by permission of the court intervened in the action in the trial court, claimed a paramount and vendor's lien in the sum of $60,000, on certain lands owned by the defendant corporation, a part of which land is covered by plaintiff's mortgages. The basis of the claim of interveners rests upon the fact that Anderson, with other persons, had conveyed the land involved herein to the corporation, and the claim for a lien represented the alleged unpaid purchase price of the property.

The defendant Gunther City Coke, Coal & Mining Company filed its answer to the petition of interveners, denying the existence of vendor's lien. Plaintiff filed his reply joining the issues presented by the petition of intervention. The defendant John H. Maack answered by way of cross-petition, setting up and alleging ownership of a promissory note in the sum of $10,500 and a mortgage covering 70 acres of the land involved, to secure said note, which note and mortgage were executed by the Gunther City Townsite Company and associated corporations, on the 1st day of July, 1922. The assault on this mortgage is directed only at the question of priority. The defendant Guernsey Savings Bank answered by way of answer and cross-petition, setting up its note and mortgage covering a portion of the premises. The proceedings relative to that mortgage are immaterial here.

The record is considerably voluminous. The evidence is of unusual length, and the pleadings and proceedings leading up to the commencement of the trial were so copious and extensive that they consume 433 pages of the case-made. For a period of time just preceding the year of 1920, the plaintiff in error Gunther operated a coal mine, or at least worked some of the land involved in this controversy for the production of coal. The enterprise seemed to be everything but a success. It clearly appears that Gunther operated almost wholly on scattered credits and overdrafts distributed in two or three different states.

Gunther's coal company became officially insolvent. A receiver was appointed for the properties of the company, and Gunther never regained possession of any of its affairs. There was no connection between Gunther's unincorporated company and the present organization, except that Gunther appears to have been a rather conspicuous and interesting figure in both. The concern involved here was incorporated in 1920, and commenced big business from the outset; that is, the business of promoting was engaged in on a big scale. One A. J. Adams appears

to have been one of the original officers. So was Gunther, one of the plaintiffs in error. Cordes, another figure, was assistant secretary for a considerable period of time. Bonn, Maack, and Wahl later came in as principal officers after placing a reasonable amount or considerable amount of cash in the corporation. Adams, Cordes and Anderson are the persons who for some time held title to the land involved herein. Gunther, who never held the record title to any of the land, claims that these persons, including plaintiff in error D. M. Anderson, held equitable title for themselves, and in addition thereto held title to the land in trust for him (Gunther). On the other hand, Adams, one of the persons holding the title to this land, testified positively that all the parties held the title in trust only for the benefit of the corporation which was being organized, and that not one of them put anything of value into the property. Adams' precise testimony on this point is as follows:

"Mr. Adams: Now, may I just look over my notes here just a minute please? I will just state this, your honor, that might be material—that the record here does show that the title to some of this land up here stood in the name of Mr. Anderson, C. B. Cordes, and myself. But those titles that were so taken were taken for the benefit of the coal company when the coal company was organized, and none of us up to that time, either Anderson, Gunther, myself or Cordes, had put any money into the proposition. We simply took the title in trust for the benefit of the coal company when it was organized, and after it was organized we transferred the titles to all of the properties that we had formerly taken in our name to the coal company, without consideration, because we hadn't anything in it, and it just having been taken as trustee for the coal company. Q. Well, then, in regard to the consideration recited in some of those deeds that the court's attention was called to this morning, where it says 'one dollar and other consideration,' there was no money actually to be paid you landowners? A. No, sir; not a dime. We hadn't paid any of our money. Now, there was money put into it, but not by Anderson or C. B. Cordes or A. C. Gunther."

After this company was organized, its board of directors and officers submitted a proposition in writing to Adams, Cordes, and Anderson to purchase this real estate which these parties had just recently taken in trust for the corporation. The proposition, however, was a straight-out offer to buy. The proposition was to issue to these parties having the legal title to the land, stocks of the corporation in the sum of $1,000,000, and $60,000 in bonds of the company, or

$60,000 in legal tender, provided, of course, the corporation could successfully float and market a proposed $200.000 bond issue. Of course, these parties, Adams, Cordes and Anderson, accepted the proposition. In fact, there was not much uncertainty about the outcome or the results of an offer regarding the matter. Adams, on the witness stand, unbends and lets himself loose in a real human way when he says (regarding the proposition to purchase):

"Q. And you were elected president of the corporation? A. Yes, sir. Q. And at that time you all made this proposition as a corporation, board of directors—to the owners of this property? A. Yes, sir. Q. And you received an acceptance from them? A. Yes. sir—well—I personally dictated the letter and I signed it as president, and Mr. Gunther as secretary—back and forth—we wrote it to ourselves and answered it ourselves."

Adams was president of the corporation and Gunther was secretary; Cordes was also an officer of the corporation.

The proposition was accepted, conveyances were made, and the $1,000,000 in stock was issued to these parties. The $60,000 was not issued or paid to them for the reason that it was more difficult to sell bonds than it was to issue stocks. The bond issue, in so far as ever realizing anything of value on it, wholly miscarried. It was probably good security, but it seems that people with money preferred securities containing less "blue," or rather, less "pale sky." It appears that this particular chapter of this frenzied finance was abandoned.

On May 29, 1922, the coal company and Gunther entered into a contract whereby, for the sum of $50,000, to be paid to him in installments, Gunther agreed to sell, transfer and assign all interest and shares of stock owned by him in the coal company, all evidence of indebtedness, and all interests of whatoesver nature held by him against and in the coal company. The contract recited that he owned 4.050 shares at least. This contract expressly stated that in case the company sold its real estate, which was its principal tangible assets, the future installments making up this sum of $50,000 would become due.

On a subsequent date, February 24, 1924, the coal company and Gunther entered into a contract expressly in lieu of the contract of May 29, 1922, and by the terms of this contract Gunther agreed to accept the sum of $5,000 as **full consideration for all his interest of whatsoever nature in the coal company.** $1,000 of this was to be paid in cash, which was paid after some considerable dif-

ficulty in raising the money; and he was given $4,000 in promissory notes. It is on these notes that the court gave him and Anderson judgment on their plea of intervention in this case.

After the coal company was organized and incorporated in 1920, the plaintiff, W. J. Intemann, was induced, principally by Gunther, to loan the company various sums of money, the amount being in the aggregate the sum recited in the mortgage. On October 13, 1921, the corporation executed to him its formal mortgage securing the said sum of $33,413. The Intemann mortgage covered 240 acres of the land which the interveners Gunther and Anderson were seeking to subject to a vendor's lien. Intemann at a later date became an officer, to wit, vice president of the corporation. On July 1, 1922, the defendant John H. Maack obtained a mortgage from the Gunther City Townsite Company on 70 acres of the land involved herein, to secure the sum of $10,500. This sum represented money which Maack had put in the enterprise, that is, in the coal mining company, and the associated corporation, the town-site company. At a subsequent date, Maack became one of the directors in the mining corporation.

It is the contention of the interveners that these mortgages, to wit, the $33,413 mortgage executed to Intemann, and the $10,500 mortgage executed to Maack, were not authorized by the board of directors of the corporation.

The interveners introduced what appears to be the major part of the minutes of the meetings of the board of directors of the corporation. These minutes failed to show any express authorization of the Intemann mortgage. However, it was not shown that the minutes which were introduced were all the minutes that had been kept of the meetings of the board of directors. On the other hand, it appears that all the minutes were not introduced unless some of the corporate transactions were not recorded, because Bonn was elected and inducted into office as president of the corporation sometime between September 24, 1920, and July, 1922, and the minutes of the proceedings introduced failed to show the election of Bonn as president. Assuming, however, that the minutes of the corporate transaction did not show the authorization of the mortgage, that alone could not be a controlling factor on the question of the validity of the mortgage.

There is a strong presumption that the acts of the officers of a corporation are regular in all respects and authorized, unless such acts are such as to forfeit property or other valuable rights. The rule is stated in 1 Jones' Commentaries on Evidence (2nd Ed.) p. 357, as follows:

"There is a presumption that the officers of the corporation have acted regularly; for example, where the common seal of the corporation appears to be attached to an instrument and the signatures of the officers are proved, the seal is presumed to have been affixed by proper authority in those cases where the execution of the instrument would be ordinarily within the power of such officers."

In this case the mortgage as required by law, bearing the signature of the president of the corporation, and attested by its secretary, with the corporate seal affixed, carried with it such a presumption of having been authorized by the board of directors that the mere silence in the minutes of the corporate transactions is wholly insufficient to invalidate the mortgage on the grounds that it was unauthorized. Furthermore, in the present case, the plaintiff corroborated the presumptive evidence of the mortgage being authorized, with the testimony of Adams, who testified that the mortgage was expressly authorized, and that he prepared the minutes.

It is fully established that parol evidence is admissible where the minutes of the corporate transactions fail to show any such proceedings. 3 Jones' Commentaries on Evidence (2nd Ed.) pp. 2706-2707, and cases therein cited.

Before the cause was tried, another action was commenced involving essentially the same matters and questions presented in this case. That action was commenced by Gunther and Anderson against the coal company to impress the land held by the coal company, to wit, 460 acres, to the same vendor's lien claimed in this action. Intemann, Maack, the Guernsey State Bank of Iowa, and others, were made defendants.

The issues in that case and in the present case were the same, save and except the other case, in which Gunther and Anderson were plaintiffs (No. 6629), involved these lands and also other lands not covered by the Intemann mortgage; and also contained a cause of action based upon an alleged indebtedness of the mining company to Gunther in the sum of $14,000.

The cases were tried together; that is, the present case was tried first, and then, by express agreement between the parties, that evidence was applied to the other case numbered 6629, wherein Gunther and Anderson were seeking, as plaintiffs, to establish the vendor's lien, and also judgment for $14,000. The judgment of the court may be summar-

ized in the court's own language in the following paragraph:

"The Court: I think that Intemann's mortgage for $33,000, commonly referred to as the big mortgage, should be decreed to be a lien on the property, subject only to the Travelers Insurance Company mortgages. I think that the cross-petitioner, John H. Maack, should have a lien on the premises described in his mortgage, subject only to the mortgages of Intemann. I think the Guernsey Savings Bank is entitled to judgment on its cross-petition. I do not think the interveners, D. M. Anderson and A. C. Gunther, are entitled to an equitable lien on the premises for the $60,000, but I am going to render judgment for the interveners, D. M. Anderson and A. C. Gunther, in the sum of $4,000 with interest thereon, in accordance with the two $2,000 notes; all as per journal entry."

The other necessary facts will be stated further in the opinion.

The major questions presented by this appeal are as follows: (1) Did the interveners, Gunther and Anderson, have a vendor's lien on the lands described in their petition of intervention? And (2) if so, was this vendor's lien superior to the $33,413 mortgage of plaintiff W. J. Intemann? And (3) was such vendor's lien, if any, superior to the mortgage of John H. Maack, which mortgage Maack set up in his answer and cross-petition?

There is no necessity for any extended discussion of the law governing the existence and establishment of vendors' liens. The principle is a survival of one of the beneficent provisions of the civil law, and in its modified form finds direct expression in our statutes (section 7427, Comp. Stat. 1921).

It was definitely established that Gunther never paid any part of the consideration for the land which is sought to be subjected to a lien. At the time it was conveyed to the newly organized corporation, or at any subsequent time, he had no such an equitable interest in the land as could be enforced in the courts. His interest at most was only potential or remote, and not a present or vested interest in the land itself. The clear circumstances, as well as the testimony, show that his interest was that of a promoter only.

Other than the testimony of Gunther, which on this point was considerably indefinite, and which was denied by Adams, Anderson had no more interest in the land than did Gunther, except that Anderson, along with others, for a time did hold the legal title to a portion of it.

The court held that the interveners did not have a vendor's lien upon the premises. This finding has ample support in the surrounding circumstances covering a long period of time, and also in the testimony of Adams. In this connection, it is observed that during all these years—1920 to 1926—Gunther never laid any claim to a vendor's lien on the property. He made no attempt to establish his lien until Intemann filed his action to foreclose his mortgage.

This man Adams was in a position to know the inside of the transaction, because he was one of the ground-floor participants with Gunther in organizing the corporation. Adams was its first president and Gunther was its first secretary, and both held such offices for a considerable time. Even outside of the testimony of Adams, we think the circumstances clearly indicate that, in conveying the land to the corporation, it was not the intention of the parties to reserve thereon a vendor's lien, regardless of what appears to be an established fact that they had no such ownership of the land as would entitle them to a vendor's lien. The issuance of the stock of the corporation to these parties in the enormous sum of $1,000,000, and the acceptance of a greater portion of it by Gunther, and the acceptance by Gunther, Adams and others, of the proposition to pay an additional $60,000 conditioned upon the company floating first mortgage bonds in the sum of $200,000, providing they could find an accommodating lender, indicates that neither Gunther nor any one of the recipients was claiming the existence of any equitable lien on the lands.

Furthermore, Gunther's numerous letters written to Intemann urging him to make investments in the corporation and advance it money show clearly that Gunther was not entertaining an intention that the land held by the corporation was subject to a secret lien. We must ascribe to Gunther and all other persons conduct in keeping with good faith, so long as such assumption is permissible. For that reason, it is not likely that Gunther would have inveigled Intemann into investing large sums of money into an enterprise and loaning large sums of money to the corporation under the representations implied, at least, that the property of the corporation was prime security and at the same time intending to fasten a prior lien on all its tangible assets.

Finally, it is contended here that the Intemann mortgage and the Maack mortgage were never introduced in evidence, and that these mortgages are outside of the case. There is no merit in that contention. The execution of these notes and mortgages was not denied under oath, and at the trial, as

provided by our statutes (section 287, Comp. Stat. 1921), the execution of these instruments was admitted. Furthermore, the theory of the case as disclosed by the admissions and express declarations of counsel for the respective parties, made just preceding the taking of the testimony, shows clearly that the questions presented were only: (1) The existence or nonexistence of a vendor's lien claimed by Gunther and Anderson; and (2) the priority between the mortgages of Maack and Intemann and the vendor's lien of Anderson and Gunther in case they succeeded in establishing such.

Regarding the admission in evidence of the Intemann and Maack mortgages, the following proceedings were had:

"Mr. Woodard: Probably the real bone of contention at this time is the claim of D. M. Anderson and A. C. Gunther, and if your honor will permit me I will make a few statements about that before we go into it. The Court: As I take it from the stipulations here that is really about the only contention. Mr. Woodard: Yes, sir. As between John H. Maack and Intemann and Anderson and Gunther; and fundamentally you are interested in seeing who is superior; that is, whether the defendants, Anderson and Gunther, on the vendor's lien— Mr. Holtzendorff (interrupting): That is the situation. Mr. Woodard (continuing): — whether or not they come ahead of Maack's mortgage and the big mortgage, or the one which is the basis of Intemann's third cause of action. Mr. Holtzendorff: The testimony will show that Mr. Maack and Mr. Intemann took their mortgages with the knowledge of the conditions under which the Gunther City Coke, Coal & Mining Company had taken title to the property. Therefore, their mortgages were subsequent to the claim of Anderson and Gunther as to the balance of the unpaid purchase price on this property."

Preceding the introduction in evidence of Intemann's notes and mortgages, the following proceedings were had:

"Mr. Woodard: Now, this (indicating the plaintiff's exhibit 10) is the mortgage that Mr. Holtzendorff is contending is not a valid mortgage. We now offer plaintiff's exhibits 7, 8, 9. and 10 in evidence. Mr. Holtzendorff: The interveners, Anderson and Gunther, will object to the introduction of plaintiff's exhibits 7. 8, 9 and 10 as incompetent, irrelevant and immaterial and not properly identified. The Court: The objection will be overruled. They will be admitted. Mr. Holtzendorff: Exception. Mr. Woodard: As I understand it, they go into evidence at this time? The Court: Yes."

Just preceding the introduction in evidence of the Maack mortgage are the following proceedings:

"The Court: You have no objection to the introduction of the copies instead of the originals, as exhibits? You do not deny the execution of them? Mr. Holtzendorff: No, we do not deny the execution of them. The Court: All right, it is admitted that the cross-petitioner John H. Maack's note and mortgage set up in his cross-petition were duly executed by the company, and I will permit you to substitute copies."

It is thus seen that the Intemann and Maack mortgages were before the court and for consideration in rendering judgment from three distinct angles: First, the pleadings; second, the stipulations; and, third, the mortgages were actually introduced in evidence, although independently of the pleadings or stipulations the identification was somewhat faulty, but no wise prejudicial to the rights of interveners. The reception in evidence, over the objections of the adverse party, of a written instrument or document without its being first properly identified, cannot be made a predicate for error on appeal, where the instrument later becomes properly identified by the pleadings and proceedings, and its execution is either proved or not denied by the pleadings of the adverse party.

This case, in so far as the same relates to the question of the existence of the liens and mortgages and their priority, is distinctly one in equity, and on review is governed by the rules regarding the review of cases of purely equitable cognizance. In view of that rule which permits this court to review and weigh the evidence, we are unable to say that the findings of the court are against the clear weight of the evidence. In fact, in giving due consideration to the testimony in the case, and the surrounding and attending circumstances, we are inclined to the view that the findings of the court are consistent with the clear weight of the evidence, instead of being against the evidence.

For the reasons herein stated, the judgment of the trial court is hereby affirmed.

BENNTTT, HERR, JEFFREY, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 7 R. C. L. p. 668; R. C. L. Perm. Supp. p. 2054. (4) 2 R. C. L. p. 203; R. C. L. Perm. Supp. p. 377. See "Appeal and Error," 4 C. J. §2869. p. 900, n. 96. "Corporations," 14a C. J. §2250. p. 397. n. 17. "Evidence," 22 C. J. §1294. p. 1011. n. 48; §1295. p. 1013. n. 53